IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DARRYL TURNER,**                               Case Number 3:14 CV 1180

      Petitioner,                               Judge Dan Aaron Polster

      v.                               Magistrate Judge James R. Knepp, II

**KEVIN JONES, WARDEN,**

      Respondent.                               REPORT AND RECOMENDATION

## INTRODUCTION

*Pro se* Petitioner Darryl Turner ("Petitioner"), a prisoner in state custody, filed a petition

seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent

Warden Kevin Jones ("Respondent") filed a Return of Writ (Doc. 9) with attached exhibits, and

Petitioner filed a Traverse (Doc. 12). The district court has jurisdiction over the Petition under §

2254(a). This matter has been referred to the undersigned for a Report and Recommendation

pursuant to Local Rule 72.2(b)(2). (Non-document entry dated September 18, 2014). For the

reasons discussed below, the undersigned recommends the Petition be dismissed.

## FACTUAL BACKGROUND

Factual findings of state courts of appeals are presumed correct unless a petitioner rebuts

them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell,* 708 F.3d

760, 775 (6th Cir. 2013). The Sixth District Court of Appeals, Erie County, made the following

findings of fact:

> On June 17, 1994, appellant, Darryl Turner, was indicted for aggravated
> murder, a violation of R.C. 2903.01; murder, a violation of R.C. 2903.02;
> felonious assault, a violation of R.C. 2903.11(A)(2); and improperly
> discharging a firearm into a habitation, a violation of R.C. 2923.161. On
> September 14, 1994, appellant was further indicted for attempted

aggravated murder, a violation of R.C. 2903.02, and felonious assault, another violation of R.C. 2903.11(A)(2). All the above charges were accompanied by a firearm specification.

It was alleged that appellant, on June 6, 1994, acting in complicity and conspiracy with Shawn Caston and Dewitt McDonald, participated in a drive by shooting at 1214 East Parish Street, in an attempt to harm Jerome Caffey. A bullet struck and killed Vivian Johnson, who was sitting in a parked automobile in front of 1214 East Parish. Sharon McGill, who was located inside 1214 East Parish, was struck by a bullet in the thigh.

A jury trial commenced on October 3, 1994, and the state presented the following evidence:

Anna Marie Hunt testified that on June 6, 1994, she was inside her residence located at 1214 East Parish Street. Also present was Jerome Caffey, Hunt's nephew, who stayed with her three to four times a week. Hunt heard gunshots, and afterwards, counted five bullet holes in her home.

Tammy Johnson testified that on June 6, 1994, she went to Anna Marie Hunt's residence, with her sister, Vivian Johnson. Johnson stayed at Hunt's residence for approximately ten minutes, while Vivian Johnson waited in the car outside. While leaving Hunt's residence, Johnson saw a car parked in the street. The vehicle started moving towards Hunt's residence, and Johnson described the car as "maroon or burgundy." She saw two "heads" inside the car, but testified that there could have been more. She heard gunshots and noticed "little flashes" coming from the vehicle. After the firing of the gunshots, Johnson returned to her vehicle to find Vivian Johnson wounded. Johnson testified that her sister died two days later.

Russell Huff, who lived at 1211 Parish Street, testified that at approximately 3:00 a.m., on June 6, 1994, he heard gunshots while located in his living room. Huff saw a burgundy automobile in front of Hunt's residence. He recalled seeing an individual leaning over the windshield of this automobile from the passenger side firing a gun in the direction of Hunt's residence. He described seeing three "heads" inside the vehicle.

Sharon McGill, a friend of Jerome Caffey, testified that on June 6, 1994, at approximately 12:00 a.m., she witnessed Caffey and Shawn Caston, arguing at Whitlee's Bar. McGill testified that she went to Hunt's residence after leaving Whitlee's. In route, she saw appellant, Dewitt McDonald, and Shawn Caston at a gas station that was ten to fifteen seconds away from Hunt's house. McGill testified that she was hit in the thigh by a bullet while inside Hunt's residence, approximately five to ten minutes after seeing appellant, McDonald, and Caston at the gas station.

Detective Jarrett of the Sandusky Police Department testified as to the contents of an interview conducted with appellant on June 6, 1994. An

2

identification of an automobile, owned by Diana Herns, Shawn Caston's girlfriend, was made through photographs, and Detective Jarrett described it as a maroon 1985 Chevy Cavalier. Detective Jarrett recovered a 9mm shell casing between the hood and windshield of this automobile. It was established later that this shell casing and shell casings found at the crime scene were fired from the same weapon.

Danielle Henderson testified that she was working at Whitlee's Bar on June 6, 1994, at approximately 12:00 a.m. She recalled that appellant, Dewitt McDonald, Shawn Caston, and Jerome Caffey were all there. Henderson witnessed an argument between Shawn Caston and Jerome Caffey at around 12:30 or 1:00 a.m. After the argument, she heard McDonald state to Caston that "he wouldn't waste his time on them niggers[,][h]e'd cap one of them." She also heard appellant tell Caston to "take care of his business and quit lettin' everybody dog you." Henderson saw appellant, Dewitt McDonald, and Shawn Caston at a gas station at approximately 2:30 a.m.

Charlotte McDaniel, a friend of Shawn Caston, testified that appellant, Caston, and Dewitt McDonald were at a gas station between 2:00 a.m. and 2:30 a.m. on June 6, 1994. She talked to Caston at the gas station, and he told her that "he was tired of this shit, I have to take care of my business." Caston then asked her for a ride to pick up his gun, but she refused. Appellant presented the following evidence.

Marseille Wooten, appellant's girlfriend, testified that appellant came home at approximately 2:15 a.m. on June 6, 1994, in the company of Shawn Caston. Wooten testified that appellant got his gun out of the bedroom closet and gave it to Caston, who then left alone. After Caston's departure, Wooten heard gunshots. She testified that appellant was on the couch in the living room during this time. The state elicited from Wooten that appellant usually transported his gun in a gym bag.

Appellant testified in his own behalf. He admitted to being at Whitlee's Bar with Shawn Caston and Dewitt McDonald. Appellant testified that he had heard about the argument between Caston and Jerome Caffey, but denied being a witness to it. Appellant recalled that Caston was angry after the argument, and he attempted to pacify Caston. Appellant testified that he, McDonald, and Caston left the bar at approximately 2:00 a.m. They stopped briefly at a gas station, but then went to appellant's residence. Caston went inside with appellant, while Dewitt McDonald left in an automobile. Appellant admitted to giving his gun to Caston because he was afraid that Caffey was going to get Caston. Caston then left alone, and appellant laid down on the couch in the living room. Appellant testified that he was laying on the couch in the living room when Marseille Wooten came out and claimed that she had heard gunshots. He denied ever being at the scene of the crime with Caston.

3

On October 7, 1994, the jury returned a verdict of guilty on all counts, except for the aggravated murder charges. Appellant was also found guilty of complicity to commit involuntary manslaughter, a lesser included offense.

Appellant was sentenced by the trial court on October 25, 1994, and received a total term of incarceration of twenty-seven years to life, plus three years actual.

(Doc. 9, Ex. 1, at *1-3).

Petitioner argues another factually relevant part of his trial was the testimony of state witness, Krista Harris. (Doc. 12, at 3). Her testimony was summarized by the Sixth District as follows:

Krista Harris testified that she saw appellant, Dewitt McDonald, and Shawn Caston together at Marseille Wooten's residence on June 5, 1994. Before leaving Wooten's residence at approximately 10:00 p.m., she testified that McDonald requested to meet with her later at a motel. Harris obtained a motel room at the Budget Inn, and McDonald arrived at approximately 3:00 a.m., on June 6, 1994. She recalled that McDonald appeared "really shaken up," "very nervous," and "walked back and forth like something was wrong." They went to bed at approximately 4:30 a.m., and awakened between 7:30 a.m. and 8:00 a.m. Harris recalled that after a telephone conversation with appellant, McDonald borrowed her car and left at approximately 8:00 a.m. McDonald was gone for about twenty minutes and returned with appellant, who was carrying a brown duffel bag. Appellant and McDonald then left the motel claiming that they were on their way to Toledo, Ohio. Harris testified further that she talked to appellant on the telephone three or four days after June 6, 1994. She stated that appellant told her that he had given Shawn Caston his gun in order to "take Jerome Caffey out." Appellant also told her that she was too deeply involved to talk to the police, and that he and McDonald had disposed of the gun. Harris also testified to having a separate telephone conversation with McDonald three or four days after June 6, 1994, who told her to provide an alibi for him during the time of the shooting. Harris testified that she talked to appellant on the telephone a second time. Appellant told Harris that he had been with Shawn Caston at the time of the shooting. Then Harris returned to the telephone conversation between McDonald and appellant on the morning of June 6, 1994, and recalled that McDonald had told appellant "things were really messed up and they had to get the gun."

(Doc. 9, Ex. 1, at *4).

4

## PROCEDURAL BACKGROUND

*Trial Court*

On June 17, 1994, Petitioner was indicted in Erie County, Ohio, as follows: Count One—aggravated murder of Vivian Johnson, with a physical harm with a deadly weapon specification; Count Two—murder of Vivian Johnson, with a physical harm with a deadly weapon specification; Count Three—improperly discharging a firearm into a habitation, with a physical harm with a deadly weapon specification; Count Four—felonious assault on Sharon McGill, with a physical harm with a deadly weapon specification; and further, each count included a firearm specification. (Doc. 9, Ex. 2, at 1-3). On September 14, 1994, Petitioner was further indicted as follows: Count Five—attempted aggravated murder of Jerome Caffey; Count Six—felonious assault of Jerome Caffey; and further, these counts included firearm specifications. (Doc. 9, Ex. 2, at 4-5).

After a jury trial,[1] Petitioner was found not guilty of Counts One and Five; guilty of the lesser included offense, complicity to commit involuntary manslaughter, for Count Two with the specifications; and guilty of Counts Three, Four, and Six with specifications. (Doc. 9, Ex. 5). The trial court sentenced Petitioner to an aggregate term of 30 years to life on October 18, 1994.[2] (Doc. 9, Ex. 5).

---

1. Respondent asserted a copy of the trial transcript could not be obtained from the Erie County Clerk's Office because the original transcript was no longer in their possession, it was apparently missing. (Doc. 9, at 5, fn. 1).
2. Petitioner's co-defendants, Shawn Caston and DeWitt McDonald, Jr., were tried separately from Turner and one another. Both were also convicted and received similar sentences.

Caston was convicted (Doc. 9, Ex. 39) and his judgment was affirmed by the Sixth District (Doc. 9, Ex. 40). Caston was granted a conditional writ of habeas corpus on October 13, 1999 (Doc. 9, Exs. 41 & 42). Upon return to the state court for a new trial, Caston pled guilty to voluntary manslaughter and was resentenced on March 29, 2002, to seven years. (Doc. 9, Ex. 39).

McDonald was convicted (Doc. 9, Ex. 43) and his judgment was affirmed by the Sixth District (Doc. 9, Ex. 44). McDonald's motion for a new trial was denied by the trial court (Doc. 9, Ex. 43) and this denial was affirmed by the Sixth District (Doc. 9, Exs. 45 & 46). In a habeas

**Direct Appeal**

Petitioner, through his trial counsel, filed a timely direct appeal on October 26, 1994, from the judgment of conviction. (Doc. 9, Exs. 6 & 7). Petitioner filed a brief, through new appellate counsel, and raised the following three errors:

1. Mr. Turner was denied his constitutional rights to effective assistance of counsel as guaranteed by the sixth amendment to the U.S. Constitution and Section 10, Article I of the Ohio Constitution when trial counsel failed to file a motion to suppress statements made by Mr. Turner when Mr. Turner admittedly was not advised of his Miranda rights.

2. The trial court committed reversible error by allowing prejudicial, irrelevant, hearsay testimony into evidence.

3. Mr. Turner's conviction was against the manifest weight of the evidence.

(Doc. 9, Ex. 8). The State filed a brief in opposition. (Doc. 9, Ex. 9). The appellate court affirmed judgment of conviction on December 8, 1995. (Doc. 9, Ex. 1).

On February 20, 1996, Petitioner, *pro se*, filed a motion for delayed appeal alleging his late filing was due to being unrepresented. (Doc. 9, Exs. 10, 11, & 12). The State opposed the delayed appeal (Doc. 9, Ex. 13) and the Ohio Supreme Court denied leave to file a delayed appeal on March 27, 1996 (Doc. 9, Ex. 14).

**Delayed Motion for New Trial**

On March 25, 2002, Petitioner, through new counsel, filed in the trial court a motion for leave to file a delayed motion for new trial. (Doc. 9, Ex. 15). The new trial motion was supported by the December 21, 2001, affidavit of Krista Harris who recanted her trial testimony from Petitioner's trial (and McDonald's trial) and averred she had a non-consensual sexual relationship with prosecutor Kevin Baxter and was forced to testify falsely in those trials. (Doc.

---

petition filed in 2008, a court found McDonald's second successive petition was time-barred. (Doc. 9, Ex. 47). This finding was upheld by the Sixth Circuit (Doc. 9, Ex. 48) and certiorari was denied by the United States Supreme Court (Doc. 9, Ex. 49).

9, Ex. 15). The motion also mentioned the success of Caston's federal habeas petition and his subsequent receipt of a reduced sentence. (Doc. 9, Ex. 15).

The State filed a brief in opposition on April 15, 2002. (Doc. 9, Ex. 16). Attached to the opposition was: an affidavit by prosecutor Kevin Baxter denying the averments made against him by Ms. Harris; a copy of a June 1994 police report dealing with Harris lying to the Grand Jury; a January 2002[3] affidavit of Frances Johnson who averred Harris admitted to lying to the Grand Jury; a January 2002 affidavit from May Ann Barylski, a former Erie County Prosecutor who averred to the lack of coercion by Kevin Baxter, Harris' expressed fear of retaliation from the suspects, and Harris' employer's allocation of funds for relocation for her safety. (Doc. 9, Ex. 16). The State amended their opposition on April 17, 2002; included with that amendment was a March 7, 2002, police report in which Caston told the police he did shoot at Caffey's residence, that he had used a "Tech-9", and that he had disposed of the firearm after leaving the scene by throwing it into some bushes. (Doc. 9, Ex. 17).

On May 2, 2003, the trial court denied the motion for leave to file a delayed motion for new trial without an opinion. (Doc. 9, Ex. 18). There was no appeal from this judgment. (Doc. 9, Ex. 4).

***Second Delayed Motion for New Trial***

On August 13, 2010, Petitioner filed a *pro se* motion for leave to file a delayed motion for new trial.[4] (Doc. 9, Ex. 4). Petitioner filed this second motion for a new trial based on Krista Harris' affidavit and his alleged discovery on February 11, 2010, of the affidavit of Becky Baxter Cones, Kevin Baxter's former spouse, who averred she had found female African-American hair in Mr. Baxter's apartment before they were married. (*See* Doc. 12, at 5-6; Doc. 9, Ex. 25, at 8).

---

3. This affidavit is improperly labeled as the November 2003 affidavit in both the Petitioner and Respondent's briefs.

4. Respondent asserts they requested a copy of this motion from the Erie County Clerk of Court; however, the Clerk's Office did not have a copy of the motion in their files. (Doc. 9, at 8, fn. 4).

Petitioner also stated he received copies of the polygraph examinations of Shawn Caston and Edward J. Baxter, Kevin Baxter's brother on March 16, 2010; and reviewed a copy of a Report and Recommendation in DeWitt McDonald's federal habeas case recommending a conditional writ be granted.[5] (*See* Doc. 12, at 6).

The State filed an opposition on August 25, 2010. (Doc. 9, Exs. 19 & 19A). The State summarized the evidence in support of Petitioner's second motion for a new trial as follows: (1) the October 13, 1999, decision granting Shawn Caston's writ of habeas corpus; (2) a November 2009 "interview summary" of Becky Baxter Cones; (3) Shawn Caston's 2002 polygraph examination results; (4) the magistrate judge's report and recommendation in DeWitt McDonald's habeas case; (5) Shawn Caston's April 2008 affidavit; and (6) Edward J. Baxter's April 2003 affidavit. (Doc. 9, Ex. 19, at 2-3). Petitioner, through new counsel, filed a response to the State's opposition on November 5, 2010. (Doc. 9, Ex. 20).

The trial court initially denied his motion on February 9, 2011. (Doc. 9, Ex. 4). On June 10, 2011, Petitioner, *pro se*, filed a motion for relief from judgment claiming timely service had not been made. (Doc. 9, Ex. 21). The State opposed this motion on June 17, 2011. (Doc. 9, Ex. 22). The trial court granted relief from judgment on June 27, 2011, and ordered the Clerk of Court to re-enter the February 9, 2011 judgment[6] on the docket to allow Petitioner a chance to timely appeal the trial court's second denial of this motion for a new trial. (Doc. 9, Ex. 23). On July 27, 2011, Petitioner, *pro se*, timely filed a notice of appeal from judgment. (Doc. 9, Ex. 26).

---

5. The report and recommendation can be found at *McDonald v. Lebanon Correctional Inst*., 2009 WL 6705408 (N.D. Ohio); this report and recommendation was not adopted. *McDonald v. Lebanon Correctional Inst*., 2010 WL 3036730 (N.D. Ohio). The rejection was upheld by the Sixth Circuit in *McDonald v. Lebanon Correctional Inst.,* 482 F.App'x 22 (6th Cir. 2012). *See also supra* fn.2.
6. The Clerk of Court re-entered the judgment on August 15, 2011. (Doc. 9, Ex. 24).

Petitioner, allegedly through new counsel,[7] filed a brief on February 1, 2012, containing the following two assignments of error:

1. Appellant Turner was denied due process and equal protection of the law, as guaranteed under the fifth, sixth, and fourteenth amendments to the United States Constitution, and Article I, Sections 1, 10, and 16 of the Ohio Constitution, where the State's willful *Brady* violation denied him the right to a fair trial.

2. Appellant Turner was denied due process and equal protection of the law, as guaranteed under the sixth and fourteenth amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, where the trial court abused its discretion in failing to provide an evidentiary hearing nor to review the trial transcript in summarily denying appellant Turner's motion for a new trial.

(Doc. 9, Ex. 27). On February 15, 2012, the Sixth District struck the appellant's brief from the record and dismissed the appeal after finding that the attorney signature on the brief was a forgery. (Doc. 9, Ex. 29).

On March 28, 2012, Petitioner filed a *pro se* motion to reinstate the appeal. (Doc. 9, Ex. 30). On April 25, 2012, the Sixth District denied the motion to reinstate the appeal as untimely because it was not filed pursuant to Ohio App.R. 26(A)(1) and alternatively, that there was no admissible evidence that his attorney had authorized him to sign her name. (Doc. 9, Ex. 31).

***Motion for Delayed Appeal from the Denial of his Second Delayed Motion for New Trial***

Petitioner, *pro se*, filed a motion for delayed appeal from the denial of his second delayed motion for new trial pursuant to Ohio App.R. 5(A) on January 28, 2013. (Doc. 9, Exs. 32 & 33). Petitioner raised the same grounds for relief as he did in his previous stricken appellate brief. (Doc. 9, Ex. 32). On March 27, 2013, the Sixth District denied the motion finding that *res*

---

7. Petitioner's appointed attorney filed a motion to withdraw as counsel claiming she did not write or file the brief and that Petitioner had forged her signature to the filing. (Doc. 9, Ex. 28). The Sixth District granted her motion to withdraw. (Doc. 9, Ex. 29). Petitioner alleges his attorney instructed him to prepare the merits brief, endorse her name on the brief, and file it with the Sixth District. (Doc. 12, at 7; Doc. 9, Ex. 9, at 4-6).

*judicata* (originating from the April 25, 2012 judgment) barred Petitioner's attempt at a delayed appeal. (Doc. 9, Ex. 34).

On May 2, 2013, Petitioner, *pro se*, filed a notice of appeal and jurisdiction memorandum with the Ohio Supreme Court. (Doc. 9, Exs. 35-37). Petitioner raised the same two assignments of error as before and additionally raised a third assignment:

> Appellant Turner was denied due process and equal protection of the law, as guaranteed under the sixth and fourteenth amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, where the Ohio Sixth District Court of Appeals denied Appellant the right to an appeal process that comports with the Fourteenth Amendment.

(Doc. 9, Ex. 37). On September 4, 2013, the Ohio Supreme Court declined jurisdiction without opinion. (Doc. 9, Ex. 38).

### FEDERAL HABEAS CORPUS

Petitioner, *pro se*, signed a Petition for writ of habeas corpus on May 26, 2014; this Petition was received by the Court on June 2, 2014. (Doc. 1). The instant Petition raised the following grounds for relief:

> **GROUND ONE**: Petitioner was denied due process and equal protection of the law, as guaranteed under the fifth, sixth, and fourteenth amendments to the United States Constitution, and Article I, Sections 1, 10, and 16  of the Ohio Constitution
>
> > **Supporting Facts**: Willful *Brady* violation denied a right to a fair trial.
>
> **GROUND TWO**: Petitioner was denied due process and equal protection of the law, as guaranteed under the sixth and fourteenth amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.
>
> > **Supporting Facts**: Trial court abused its discretion in failing to provide an evidentiary hearing []or to review the trial transcripts in summarily denying appellant's motion for new trial.

(Doc. 1).

JURISDICTIONAL BAR

*Statute of Limitations*

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") created a one-year limitations period for habeas petitions brought by individuals challenging their state court convictions. 28 U.S.C. § 2244(d). Under 28 U.S.C. § 2244(d)(1), the limitations period begins to run from the latest of four events:

> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Since, Petitioner does not raise any claim of State impediment or newly recognized constitutional law; the Court will only undertake an analysis of subsections (A) and (D).

Section 2244(d)(1)(A)

Cases become final for purposes of § 2244(d)(1)(A) when the time to file an appeal has expired, including the time to seek certiorari in the United States Supreme Court. *Lawrence v. Florida*, 549 U.S. 327, 333 (2007); *Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000). Under Rule 6(a)(1)(A), the statutory clock starts the day after the triggering event. Fed.R.Civ.P. 6(a)(1)(A). Applied to the case at bar, the triggering event is "the expiration of the time for seeking [direct] review" in the Ohio Supreme Court. § 2244(d)(1)(A); *Bronaugh v. Ohio*, 235 F.3d 280, 284-85 (6th Cir. 2000).

11

Here, Petitioner had 45 days from the date the Ohio Sixth District Court of Appeals affirmed the judgment of the trial court to perfect an appeal to the Ohio Supreme Court. S.Ct.Prac.R. 7.01(A)(1)(a)(i). Petitioner failed to perfect his direct appeal to the Ohio Supreme Court within that period. The Sixth District affirmed his conviction on December 8, 1995; thus, the one-year habeas period began running on January 22, 1996, one day after the period for seeking review in the Ohio Supreme Court had expired. The statute then ran for 28 days until Petitioner filed a motion for delayed appeal on February 20, 1996. Importantly, a motion for delayed appeal will toll the statute of limitations but is not part of the "direct appeal" for purposes of 28 U.S.C. § 2244(d)(1). *See DiCenzi v. Rose*, 452 F.3d 465, 468 (6th Cir. 2006); *Keeling v. Warden, Lebanon Correctional Inst.,* 673 F.3d 452, 459 (6th Cir. 2012) (a motion for delayed appeal will not cause the statute of limitations to begin running anew.). The statute was tolled during the pendency of this motion—ultimately, denied by the Ohio Supreme Court on March 27, 1996—and the 90-day period to seek certiorari in the United States Supreme Court, which concluded on June 25, 1996. On June 26, 1996, the statute began running again; and ran uninterrupted for the remaining 337 days until May 28, 1997.[8]

Thus unless equitable tolling or another statutory provision applies, the Petition filed on May 26, 2014, is untimely.

Section 2244(d)(1)(D)

Petitioner's claim of a *Brady* violation contained in Ground One of his Petition was allegedly discovered on February 11, 2010 (Petitioner also mentioned the date March 16, 2010 in his Traverse), and was presented for the first time in his second delayed motion for a new trial in

---

8. Here, Petitioner's conviction predated the enactment of AEDPA; and any petition for writ of habeas corpus would be considered timely if it was filed before April 24, 1997. *Brown v. O'Dea*, 187 F.3d 572 (6th Cir. 1999), *vacated on other grounds*. However due to tolling, Petitioner's actual deadline for filing his habeas petition exceeded the mandated timeliness date; regardless, Petitioner's habeas petition was filed until seven years late.

August 2010. (Doc. 1; Doc. 12, at 5-6). This second delayed motion for a new trial was based on the affidavit of Krista Harris; Shawn Caston's grant of habeas corpus in 1999; information relating to Becky Baxter Cones from 2009; Shawn Caston's 2002 polygraph results; a 2009 report and recommendation in DeWitt McDonald's habeas corpus; Shawn Caston's 2008 affidavit; and Edward J. Baxter's 2008 affidavit. (Doc. 9, Ex. 19, at 2-3).

Even presuming that Petitioner could not have discovered this information through due diligence prior to his alleged date, which is unlikely considering he had previously challenged his conviction based on the recantation of Harris' testimony and Caston's conditional grant of habeas corpus, and all the other evidence was in existence by November 2009; the instant Petition is still untimely. Petitioner was required to file his habeas petition within a year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." § 2244(d)(1)(D).

Accepting the latest date presented by Petitioner—March 16, 2010—he had one year from the day after this date to file his habeas petition. The statute of limitations ran for 149 days until August 13, 2010, when Petitioner filed his second delayed motion for a new trial.[9] *See Colbert v. Tambi*, 513 F. Supp.2d 927, 932, n.2 (S.D. Ohio). The statute was tolled during the pendency of this motion until the Sixth District dismissed the Petitioner's appeal of the trial court's denial of his second delayed motion for a new trial on February 15, 2012. The statute began running again on April 2, 2012, the expiration of the 45-day period in which to seek review in the Ohio Supreme Court. The statute then ran uninterrupted for the remaining 216 days of the one-year period until November 5, 2012.

---

9. Petitioner's motions for a new trial meet the definition for post-conviction relief eligible to toll the limitations period. *See State v. Briscoe*, 2004 WL 1753144, at *2 (8th Dist. Ohio); *Pudleski v. Wilson*, 576 F.3d 595, 609-10 (6th Cir. 2009).

Petitioner's March 28, 2012, motion to reinstate the appeal does not operate to toll the statute of limitations because the Sixth District found the motion was untimely. To fall under the tolling provision, Petitioner's motion must be a qualifying state collateral action and be properly filed. *Artuz v. Bennett,* 531 U.S. 4, 8-9 (2000). A state application for post-conviction relief is "properly filed" within the meaning of § 2244(d)(2) "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings, such as those prescribing the time limits for filing." *Id.* at 8. State courts are the final arbiters of whether a state collateral action is considered timely, and thus, properly filed. *Pace v. Diguglielmo*, 544 U.S. 408, 417 (2005). A state post-conviction petition rejected by the state court on timeliness grounds is not properly filed and, therefore, it cannot serve as the basis for statutory tolling. *Allen v. Siebert*, 552 U.S. 3, 5 (2007).

Nor does Petitioner's motion for delayed appeal to the Ohio Supreme Court on January 28, 2013, serve to toll the limitations period because the one-year period had already expired. *See Vroman v. Brigano,* 346 F. 3d 598 (6th Cir. 2003) (petitioner's later proceedings in state court do not operate to toll the statute of limitations since they were all filed after the one-year habeas period had expired).

Thus, absent equitable tolling, the Petition for habeas corpus filed on May 26, 2014, is untimely.[10]

---

10. Petitioner makes a vague assertion that he learned other material evidence at DeWitt McDonald's federal habeas evidentiary hearing on June 29, 2010, but he does not identify what evidence that is. (*See* Doc. 12, at 12). Because Petitioner does not provide identification of this newly discovered evidence, the Court declines to utilize this later date. Even accepting this later date for the beginning of his one-year limitations period, his petition is still untimely. The statute ran for fourteen days until he filed his second delayed motion for new trial on August 13, 2010. It was tolled until April 2, 2012, then ran for 300 days until Petitioner filed his motion for delayed appeal on January 28, 2013. The statute was again tolled until September 4, 2013, and ran for the remaining 51 days of the one-year period until October 28, 2013 (the next weekday following the expiration of the one-year period on October 26, 2013).

*Equitable Tolling*

"[T]he doctrine of equitable tolling allows federal courts to toll a statute of limitations when 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Keenan v. Bagley*, 400 F.3d 417, 421 (6th Cir. 2005) (*quoting Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 560-61 (6th Cir. 2000)). Petitioner bears the burden of proving an entitlement to equitable tolling. *See Griffin v. Rogers*, 308 F. 3d 647, 653 (6th Cir. 2002). Equitable tolling should only be granted "sparingly". *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006). To be eligible for equitable tolling, a petitioner must prove "1) that he has been pursuing his rights diligently; and 2) that some extraordinary circumstance stood in his way." *Pace,* 544 U.S. at 418; *Holland v. Florida*, 560 U.S. 631 (2010).[11]

First, in reviewing the record, the Court finds that Petitioner is not entitled to equitable tolling because he proved neither diligence in pursuing his rights nor the existence of an extraordinary circumstance. Petitioner argues he was diligent in pursuing his second delayed motion for a new trial upon discovery of new evidence, and it was only due to the dishonesty of his attorney that his appeal was dismissed. (Doc. 12, at 12). Setting aside his improbable assertion that it is common practice by attorneys to have their clients write a brief, sign the attorney's name, and file briefs on their own behalf, Petitioner still did not prove diligence. After his appeal brief was struck from the record and the appeal dismissed by the Sixth District, Petitioner did not appeal that decision to the Ohio Supreme Court and then he waited over a month to file a motion to reinstate his appeal. Following the Sixth District's denial of his motion

---

11. Respondent erroneously cites to the previous standard of the Circuit, the five-factor test established in *Dunlap v. United States*, 250 F.3d 1001, 1008 (6th Cir. 2001), as the applicable standard for determining equitable tolling. (Doc. 9, at 20). The Sixth Circuit explicitly rejected the five-factor *Dunlap* test in *Hall v. Warden, Lebanon Correctional Inst.*, 662 F.3d 745 (6th Cir. 2011) in favor of the two-factor test laid out above.

to reinstate the appeal, Petitioner did not seek direct appeal to the Ohio Supreme Court; instead, he waited over eight months to file a motion for delayed appeal on his second delayed motion for new trial in the Sixth District.

Further, his actions well before this date do not indicate diligence. He was untimely in appealing his original conviction to the Ohio Supreme Court and did not attempt to file a federal habeas petition to challenge his conviction. Upon discovery of Krista Harris' recantation of her testimony in 2002, Petitioner did not seek direct review of the denial of his first delayed motion for new trial in either the appellate court or the Ohio Supreme Court nor did he attempt to file a federal habeas petition based on this new evidence. Lastly, even presuming Petitioner did not have newly discovered evidence until March 2010, he provides no rationale for why he waited almost five months to file his second delayed motion for new trial.

In sum, Petitioner has not proven that he diligently pursued his rights and has made no showing of an extraordinary circumstance that prevented his filing of this Petition in a timely manner.

### Actual Innocence

In the extreme circumstance, a petitioner can excuse the requirement of timely filing through a showing of actual innocence under the "miscarriage of justice" standard. *Schlup v. Delo*, 513 U.S. 298 (1995); *see Perkins v. McQuiggin*, 670 F.3d 665, 675 n.3 (6th Cir. 2012) (finding it more appropriate to think of a claim for actual innocence as an exception to the procedural barrier, rather than a vehicle for equitable tolling). In these cases, a credible showing of actual innocence operates to excuse procedural bars that would prevent a habeas petition. *See Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). To be credible, a petitioner must support his allegations of constitutional error "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not

16

presented at trial." *Schlup*, 513 U.S. at 324. A court must find that petitioner proved "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. Importantly, "actual innocence means factual innocence, not mere legal insufficiency." *Souter,* 395 F.3d at 590 (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

In support of Petitioner's claim of actual innocence, he relies mainly on the recantation of trial testimony by Krista Harris, because without her testimony he would not have been tied to the event. Petitioner also argues the statements of Becky Baxter Cones and Edward J. Baxter lend support to Harris' accusations against Kevin Baxter and Shawn Caston's polygraph examination absolves him of wrongdoing. (Doc. 12, at 10-11). Contrary to Petitioner's arguments, the Respondent asserts that Harris' recantation has already been adjudicated unreliable in DeWitt McDonald's federal habeas case; a finding affirmed by the Sixth Circuit. (Doc. 9, at 23).

The district court addressed the reliability of Harris' affidavit in McDonald's federal habeas case as follows:

> As to new evidence contained in affidavits, a court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 531. "[R]ecanting affidavits are always viewed with 'extreme suspicion.'" *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) (quoting *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991)). A court need not accept all new facts submitted by a petitioner as true; rather, credibility determinations are appropriate. *See Schlup*, 513 U.S. at 531 ("[A c]ourt is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment.")
>
> Under the actual innocence framework, the basic question in this case is whether Harris' 2001 affidavit, and her concurrent interview with the BCI agents, constitutes "new, reliable" evidence that undermines confidence in the outcome of [McDonald's] trial. This Court concludes that Harris' allegations are not reliable, and therefore [McDonald] has not established a viable actual innocence claim. The evidence undermining the reliability of Harris' new allegations is considerable: she made them many years later

while facing her own criminal charges, she was represented by an attorney known to fabricate accusations against public officials, she has told at least three different stories about the night of the shooting, and she is now [at an evidentiary hearing] unable, or unwilling, to recall any details whatsoever about her allegations against Baxter or her role in [McDonald's] trial. By contrast, the evidence corroborating Harris' allegations -- the checks from Baxter's office and Harris' knowledge of the interior of Baxter's house -- is slim at best, and subject to reasonable alternative explanations.

First, Harris had a personal motive for making allegations against Baxter, as she was under indictment on theft charges at the time. The BCI agents noted in a letter to Harris' attorney that Harris wanted the investigation against Baxter concluded within weeks -- before her own trial -- and that Harris became aggravated when the agents explained that the investigation would take time. Agent Dendinger confirmed at the evidentiary hearing that Harris wanted to "control" the interview and was generally uncooperative with the agents. Harris' apparent desire that her allegations of prosecutorial misconduct forestall her own criminal case undermines the reliability of her affidavit.

Second, Harris' relationship with Elsebeth Baumgartner in December 2001 casts further doubt on the truth of Harris' allegations. Baumgartner's history of unfounded accusations against public officials is well-documented. Harris' affidavit was attached to a motion filed by Baumgartner, and though the record contains no direct evidence on this point, it seems likely that Baumgartner drafted the affidavit. Denise Demmitt believed that Baumgartner inserted herself in Harris' case in order to advance Baumgartner's own conspiracy theories. Baumgartner's bizarre behavior leading up to the hearing on her motion to disqualify Special Prosecutor Holman supports Demmitt's view; Baumgartner subpoenaed sixty witnesses for the hearing, including the Ohio Supreme Court Chief Justice. In sum, the circumstances surrounding the creation of Harris' affidavit undermine its reliability.

Third, Harris' general lack of credibility is obvious. [McDonald's] counsel conceded as much at the evidentiary hearing (Tr. 124) ("[McDonald] is not here vouching for Krista Harris' credibility. . . That would be a fool's errand."). She has told three different stories about the night of the shooting: at the initial grand jury, where she said [McDonald] was with her in the hotel room before the shooting; at the second grand jury and trial, where she reversed course and implicated [McDonald] in the shooting; and to BCI agents in 2001, where she said she did not know if [McDonald] was involved, but that the "word on the street" said he was.

Now, Harris is unable or unwilling to recall details of any version, nor even the fact that she once told them, and has no other credible support for her 2001 allegations against Baxter. [McDonald] suggests that Harris is unwilling to speak because she is afraid of Kevin Baxter. Yet she was

willing to speak against him in 2001, and he wielded the same power as a county prosecutor then as he does now. [McDonald] offers no evidence that Harris has been threatened into silence by Baxter or anyone else.

As for the checks Baxter wrote to help Harris move from Sandusky to Cleveland in 1995, he has never denied using his office's funds for that purpose. Baxter testified in 2002, and again at the evidentiary hearing, they were proper and legitimate expenditures based on Harris' fear of retaliation by [McDonald] or his friends. Detective Prewitt confirmed that Harris had requested assistance moving out of Sandusky.

As for Harris' apparent knowledge of the details of Baxter's house, which she related to BCI agents, the parties dispute whether Harris' account is accurate. Baxter testified that some details were accurate and some were not, and that Harris' description was missing some significant features. Even assuming Harris' description was accurate, she could easily have learned details of Baxter's house from someone else -- Baxter's disgruntled brother [Edward J. Baxter], for instance. Given the existence of reasonable alternative explanations for the checks and for Harris' sketchy knowledge of Baxter's house, this corroborating evidence is of little value.

(Doc. 9, Ex. 47, at 18-21). In the instant case, Petitioner does not present any additional evidence or arguments to refute the reasoning of the district court. Rather, he simply asks that Harris' affidavit be taken at face value, as was done in the 2009 report and recommendation in McDonald's habeas case. However, this Court declines to ignore the credibility determination made by the district court (which also explicitly rejected the 2009 report and recommendation), especially when Petitioner has made no attempt to undermine or attack its conclusions. Petitioner has not brought forth any evidence that circumstances have changed in the intervening six years or that further evidence corroborating Harris' affidavit now exists which was not available at the time. Thus, the previous determination of the district court, as affirmed by the Sixth Circuit, is sound.

Petitioner's claim of actual innocence also relies on other pieces of evidence: the affidavit of Edward J. Baxter and Shawn Caston's polygraph examination. Still, both of these pieces of evidence were analyzed in McDonald's federal habeas case. The district court found Edward J. Baxter's affidavit to provide no support for Harris' allegations because his knowledge of the

alleged sexual relationship was derived from what Harris had told him, and he confirmed as much in a 2002 deposition. (Doc. 9, Ex. 47 at 21). The Sixth Circuit acknowledged that Edward J. Baxter had a motive to lie about his brother and that he had admitted under oath to "facilitat[ing] the communication of false information regarding my brother, Kevin J. Baxter to other individuals." (Doc. 9, Ex. 48, at 20). As to Shawn Caston's polygraph examination, the Sixth Circuit noted the examiner never asked Caston questions about his alleged accomplices or whether he acted alone; this is borne out by the polygraph examiner's report. (Doc. 9, Ex. 48, at 20; Doc. 9, Ex. 17, at 8). Caston's admission of wrongdoing is not evidence that Petitioner is innocent of complicity; especially, when Petitioner admits to giving Caston the weapon. Thus, this Court fails to see how Caston's polygraph examination has any bearing on Petitioner's involvement in the crime; particularly, when Caston was never asked about Petitioner. Further, Petitioner raises no argument or new evidence to support an altered finding on credibility or relevance from that of the previous courts and so, this Court finds the reasoning persuasive.

The last piece of evidence Petitioner puts forward in support of his actual innocence claim is the affidavit of Becky Baxter Cones; he alleges her affidavit lends credibility to Harris' claims of an illicit sexual relationship with Kevin Baxter. (Doc. 12, at 10-11). Ms. Cones avers that prior to their marriage she found, what she believed to be, female African-American hair in Kevin Baxter's bathroom. The Court fails to see how this information is relevant to Harris' credibility: Ms. Cones had no personal knowledge of Harris' allegations and makes no assertion that the hair found was Harris'; thus, her discovery of female hair in Kevin Baxter's bathroom at some unidentified date prior to their marriage is worthless to this Court. Ms. Cones goes on to attempt to identify all the cars Harris alleged Kevin Baxter drove during their relationship. Again, her statements are based on little more than assumption. Further, Ms. Cones' reliability is

questionable as at the time she made these statements she was suing her husband for child support.

Overall, Petitioner has failed to present "new, reliable" evidence that would undermine this Court's confidence in Petitioner's conviction. He therefore failed to make a showing of actual innocence, and this Court will not excuse his untimeliness.

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Petition be dismissed as time-barred.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).